UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

COALITION ON WEST VALLEY NUCLEAR WASTES
AND JOANNE E. HAMEISTER,

                          Plaintiffs,

          -vs-                                    05-CV-0614-C

SAMUEL BODMAN, SECRETARY, DEPARTMENT OF
ENERGY, UNITED STATES OF AMERICA AND
UNITED STATES OF AMERICA,

                          Defendants.

_____

APPEARANCES:   THE KNOER GROUP, PLLC (ROBERT E. KNOER, ESQ., of
               Counsel), Buffalo, New York, for Plaintiffs

               UNITED STATES DEPARTMENT OF JUSTICE (MARY K.
               ROACH, Assistant United States Attorney, of Counsel),
               Buffalo, New York, for Defendants

     Plaintiffs initiated this action on August 26, 2005, pursuant to the judicial review

provision of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, seeking to compel

defendants' compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C.

§§ 4321 *et seq.*, and to enforce the "Stipulation of Compromise Settlement" ("Stipulation")

entered into by the parties in 1987 in connection with prior litigation in this court entitled

*Coalition on West Valley Nuclear Wastes, et al. v. United States Department of Energy,*

*et al.*, Civ. No. 86-CV-1052C.  Plaintiffs have filed a motion for summary judgment (Item

14) pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking a ruling that the

process by which the defendants are proceeding with management of radioactive waste

at the Western New York Nuclear Service Center in West Valley, New York, is in breach

of the Stipulation and in violation of NEPA.  Defendants have filed a cross-motion for

summary judgment (Item 20) dismissing the complaint.  Oral argument of these motions was heard by the court on December 4, 2006, with follow-up argument on May 22, 2007.

For the reasons that follow, plaintiffs' motion for summary judgment is denied, and defendants' cross-motion for summary judgment is granted.

## BACKGROUND

### A.    The Western New York Nuclear Service Center

The Western New York Nuclear Service Center (the "Center") is a radioactive waste management facility located on a five-square-mile site in West Valley, approximately 30 miles southeast of the City of Buffalo.  From 1966 to 1972, the Center operated as a commercial nuclear fuel reprocessing plant under a license issued by the federal Atomic Energy Commission (now the Nuclear Regulatory Commission ("NRC")) to Nuclear Fuel Services, Inc. ("NFS"), a private contractor, and the New York State Atomic and Space Development Authority, now known as the New York State Energy Research and Development Authority ("NYSERDA").  Activities at the site included the recovery of uranium and plutonium from spent nuclear fuel by means of a solvent extraction system. Radioactive waste from this process was chemically neutralized and remained on-site in underground storage tanks or buried in two separately designated waste burial grounds – a 20-acre State-licensed Disposal Area (the "SDA"), and the adjacent 7-acre NRC-licensed Disposal Area (the "NDA") (*see* AR 50, 53).[1]

---

[1]Unless otherwise noted, numeric references preceded by "AR" are to the pages of the Administrative Record compiled by Daniel W. Sullivan (NEPA Compliance Officer for the West Valley Demonstration Project) and lodged – but not filed – with the Clerk's office on June 14, 2006.

Fuel reprocessing ended in 1972, when the plant was shut down for modifications to increase capacity and implement occupational safeguards.   In 1976, due to the perceived costs of upgrading and reopening the plant to comply with changing regulatory requirements (estimated at over $600 million), NFS decided to withdraw from the nuclear fuel reprocessing business and exercised its contractual right to yield responsibility for the Center to NYSERDA.  NFS withdrew from the site without removing any of the in-process nuclear wastes.  NYSERDA now holds title to the site and manages the Center on behalf of the State of New York (AR 50).

## B.     The West Valley Demonstration Project Act

In 1980, Congress passed the West Valley Demonstration Project ("WVDP") Act, Pub. L. No. 96-368, 94 Stat 134742 (October 1, 1980), which requires the United States Department of Energy ("DOE") to demonstrate that the liquid high-level waste ("HLW")[2] from reprocessing can be safely managed by solidifying it at the Center and transporting it to a geologic repository for permanent disposal.   Specifically, Section 2(a) of the Act provides:

Under the project the Secretary shall carry out the following activities:

(1) The Secretary shall solidify, in a form suitable for transportation and disposal, the high level radioactive waste at the Center by vitrification or by such other technology which the Secretary determines to be the most effective for solidification.

---

[2] The various categories of radioactive wastes present at the WVDP are referred to in the Administrative Record as high-level waste ("HLW"), low-level waste ("LLW"), mixed waste ("MW"), and transuranic waste ("TRU").  LLW is further delineated as Class A, B or C LLW.  These terms apply to wastes of various constituencies distinguished mainly by different levels of radioactivity and stability  (*see* AR 61, Table 1-1).

(2) The Secretary shall develop containers suitable for the permanent disposal of the high level radioactive waste solidified at the Center.

(3) The Secretary shall, as soon as feasible, transport, in accordance with applicable provisions of law, the waste solidified at the Center to an appropriate Federal repository for permanent disposal.

(4) The Secretary shall, in accordance with applicable licensing requirements, dispose of low level radioactive waste and transuranic waste produced by the solidification of the high level radioactive waste under the project.

(5) The Secretary shall decontaminate and decommission--,
(A) the tanks and other facilities of the Center in which the high level radioactive waste solidified under the project was stored,
(B) the facilities used in the solidification of the waste, and
(C) any material and hardware used in connection with the project, in accordance with such requirements as the [Nuclear Regulatory Commission ("NRC")] may prescribe.

(Pub. L. No. 96-368, § 2(a); *see* AR 52).

In the 26 years since the WVDP Act was enacted, DOE has accomplished only actions (1) and (2) – vitrifying (*i.e.*, solidifying as a glass composite) 600,000 gallons of high level liquid waste resulting from the reprocessing of spent nuclear fuel, and developing stainless-steel canisters suitable for permanent disposal of HLW (*id.*). DOE's completion of the remaining statutory requirements – transportation and disposal of the wastes, and decontamination and decommissioning of the facilities at the Center – forms the basis of the current dispute.

### C.    The 1986 Litigation

In the mid-1980s, DOE proposed to store drums of LLW on-site in an engineered disposal area located near the NDA.  In support of this proposed action, DOE undertook

environmental review under NEPA, resulting in preparation of an environmental assessment ("EA") in April 1986, and a finding of no significant impact ("FONSI") dated August 6, 1986 (*see* AR at 56).[3]

The Coalition on West Valley Nuclear Wastes was formed in 1974 and participated as an intervenor in some of the regulatory proceedings that occurred between the time of the shutdown of the reprocessing plant in 1972 and NFS's decision to withdraw from the site. In November 1986, the Coalition filed a lawsuit challenging DOE's proposal for on-site radioactive waste storage, primarily attacking the August 6, 1986 FONSI as contrary to NEPA's environmental impact statement ("EIS") requirements (*see Coalition on West Valley Nuclear Wastes, et al. v. United States Department of Energy, et al.*, Civ. No. 86-CV-1052C, Item 1). Then, in January 1987, the Coalition brought a motion for a preliminary injunction seeking to enjoin the construction of the proposed LLW disposal facilities "unless an [EIS] is prepared, circulated and filed pursuant to [NEPA] . . . " (*id.*, Item 2).

Prompt settlement negotiations between the parties resulted in entry of the Stipulation of Compromise Settlement on May 27, 1987, which provided in part as follows:

> 3.     The [DOE] had planned to prepare an [EIS] concerning closure for the post-solidification phase of the [WVDP]. The defendant hereby agrees that the scope of that [EIS] shall include the following:
>
> a.     Disposal of those Class A wastes generated as a result of the activities of the [DOE] at the [WVDP] as mandated by the United States

---

[3]The proposed action for on-site LLW disposal set forth in the August 6, 1986 FONSI called for disposal of Class A waste below grade in a series of engineered trenches with clay covers, and disposal of Class B/C waste above grade in an earth mound, or "tumulus," with a composite cover consisting of "compacted clay, gravel and rip-rap." 1986 FONSI, p. 7, attached as Ex. B to Complaint in Civ. No. 86-CV-1052.

Congress under the [WVDP] Act.  However, in lieu of undertaking such an EIS, the defendant reserves the right to:

    I.    dispose of the Class A wastes in accordance with applicable law at a site other than the Center; or

    ii.    evaluate disposal of those Class A wastes in a separate EIS; or

    iii.    seek and obtain [NRC] review and approval of any proposed disposal methodology for such Class A wastes at the Center.

    b.    The disposal of those Class B/C wastes generated as a result of the activities of the [DOE] at the [WVDP] as mandated by the United States Congress under the [WVDP] Act.

    4.    The parties hereby agree that the closure [EIS] process -- including the scoping process -- shall begin no later than 1988 and that this process shall continue without undue delay and in an orderly fashion consistent with applicable law, the objectives of the [WVDP], available resources and mindful of the procedural processes (including public input) needed to complete the aforesaid [EIS]. . . .

(*Id.*, Item 21; AR 197-98).

### D.    Activities Since the 1987 Stipulation

On December 30, 1988, DOE issued a "Notice of Intent To Prepare an Environmental Impact Statement for Completion of West Valley Demonstration Project Activities and Closure of the Western New York Nuclear Service Center" (53 Fed. Reg. 53052 (1988); *see also* AR 56).  In January 1996, DOE and NYSERDA issued a "Draft Environmental Impact Statement for Completion of the West Valley Demonstration Project and Closure or Long-Term Management of Facilities at the Western New York Nuclear Service Center" (AR 2046-3147).  While the 1996 Draft EIS evaluated the environmental impacts of several alternatives for closure or long-term management of the facilities at the Center, it did not specify a preferred alternative because DOE and NYSERDA were unable

to reach agreement on the overall future course of action for the site (*see* AR 56; *see also generally*, AR 1059-1104 (May 2001 Report of U.S. General Accounting Office, "Nuclear Waste – Agreement Among Agencies Responsible for the West Valley Site is Critically Needed")).  As a result of the ongoing disagreement between the lead agencies, the 1996 Draft EIS was never issued as a final EIS.

Instead, on March 26, 2001, DOE issued a "Notice of Revised Strategy for the Environmental Impact Statement for Completion of the West Valley Demonstration Project and Closure or Long-Term Management of Facilities at the Western New York Nuclear Service Center and Solicitation of Scoping Comments" (66 Fed. Reg. 16447; *see also*  AR 861-65).  As explained in the Notice, based on public comments to the 1996 Draft EIS, as well as feedback from the Citizen's Task Force and ongoing discussions with NYSERDA and the NRC, the DOE determined that it would conduct the NEPA process for the remaining actions required by the WVDP Act in two separate environmental impact statements (referred to by defendants as the "Waste Management EIS" and the "Completion and Closure EIS") (*see* AR 862).  Specifically, the March 26, 2001 Notice of Intent provided:

> Under the revised strategy, DOE will prepare and issue a revised draft EIS for public comment focusing on DOE's actions to decontaminate [WVDP] facilities and manage WVDP wastes controlled by DOE under the [WVDP] Act . . . .  Further, DOE intends to issue soon a Notice of Intent for a second EIS, with NYSERDA as a joint lead agency, on decommissioning and/or long-term stewardship of the WVDP and the Western New York Nuclear Service Center (WNYNSC).  This approach is expected to facilitate decisions in a more tractable and timely fashion.

(*Id.*).

The DOE issued the Waste Management EIS, entitled "Final West Valley Demonstration Project Environmental Impact Statement," in December 2003 (AR 33-396), and published the related Record of Decision (the "Waste Management ROD") on June 16, 2005 (70 Fed. Reg. 35073; AR 1-5).  The Waste Management EIS identified the following three alternatives for waste management activities which the DOE needs to conduct to meet its remaining responsibilities under the WVDP Act:

1.      No Action Alternative--Continuation of Ongoing Waste Management Activities;

2.      Alternative A--Off-Site Shipment of HLW, LLW, MLLW, and TRU Wastes to Disposal;

3.      Alternative B--Off-Site Shipment of LLW and MLLW to Disposal, and Shipment of HLW and TRU Waste to Interim Storage.

(*see* AR 58, 69).

As explained in the Waste Management ROD, DOE decided to "implement partially" Alternative A as the environmentally preferable action alternative with the fewest transportation impacts and the least radiological risk to workers and the public (70 Fed. Reg. 35077; AR 5).  The plan under Alternative A calls for shipment of LLW and MLLW off-site for disposal at DOE or commercial radioactive waste disposal sites; continued on-site storage of vitrified HLW canisters until they can be shipped to a geologic repository for final disposal; and deferral of a decision on the disposal of TRU waste pending a determination by the DOE that the waste meets all statutory and regulatory requirements for disposal at the Waste Isolation Pilot Plant ("WIPP") near Carlsbad, New Mexico (*id.*).  As set forth in the ROD:

Alternative A (Off-site Shipment of HLW, LLW, MLLW, and TRU Wastes to Disposal) is the environmentally preferable alternative.  Because less

-8-

radioactive waste would be transported under the No Action Alternative, implementation of that alternative is likely to result in the smallest impacts over the next ten years as compared to Alternatives A or B. Over time, however, the removal of waste from the WVDP site to a safer and more secure disposal site will reduce radiological risk to workers and the public. Alternative A would have the smallest transportation risks among the action alternatives because implementation of this alternative would require half the number of TRU waste and HLW shipments as under Alternative B, and potential transportation risks decrease as the number of miles traveled and individual shipments decrease.

(70 Fed. Reg. 35076; AR 4).  The ROD further states that the decision to ship low-level and

mixed low-level radioactive wastes off-site "includes wastes DOE may determine in the

future to be LLW or MLLW pursuant to a waste incidental to reprocessing by evaluation

process"  (70 Fed. Reg. 35077; AR 5).


E.    **The Present Action**

Plaintiffs brought this subsequent lawsuit in August 2005, after the DOE issued the

June 16, 2005 ROD.  Plaintiffs claim that the actions proposed in the ROD are in violation

of NEPA and the 1987 Stipulation.   Specifically, plaintiffs allege that the decision to

"descope" or "rescope" the EIS – *i.e.*, to split the EIS process into the Waste Management

EIS and the Completion and Closure EIS – breaches the contractual terms of the

Stipulation, which contemplates a single EIS "that firmly and finally decides how DOE will

perform its post-vitrification activities of closure, decontamination, decommissioning, and

waste disposal" under the WVDP Act (Item 1, ¶ 88).  Plaintiffs also allege that the two-EIS

approach violates NEPA's policy prohibiting "segmentation" of a large project into smaller

projects without considering the overall effect of the separate phases (*id.* at ¶ 112-119),

and that the DOE has no authority to reclassify waste pursuant to a "waste incidental to

reprocessing" procedure (*id.* at ¶ 121).   Plaintiffs now seek a ruling granting summary judgment in their favor on each of these claims, and granting their request for attorney's fees under the Equal Access to Justice Act.

Defendants respond that plaintiffs have failed to meet their burden to demonstrate either a breach of the Stipulation or violation of NEPA as a matter of law.   According to defendants, the record reflects that the DOE has proceeded in compliance with NEPA and the Stipulation toward a final decision on closure of the site, making well-reasoned interim decisions – fully aired for public comment – on how best to manage the site and further the goals of the WVDP Act while the closure decision is being made.   Defendants also contend that plaintiffs' claim regarding DOE's authority to reclassify wastes as "incidental to reprocessing" has no merit, and is not cognizable in any event because no specific reclassification has occurred.

Each of these contentions is discussed in turn.


## DISCUSSION

### I.   Compliance with NEPA

NEPA was enacted in 1970 with the express Congressional declaration of purpose:

> To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality ["CEQ"].

42 U.S.C. § 4321.   To carry out these lofty purposes, NEPA requires federal agencies to prepare an EIS before taking any major action "significantly affecting the quality of the

human environment." 42 U.S.C. § 4332(2)(C).  The purpose of an EIS is to "provide full and fair discussion of significant environmental impacts and [to] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize the adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1;[4] *Stewart Park and Reserve Coalition, Inc. (SPARC) v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003).

As explained in *SPARC* and several other cases, "NEPA is a procedural statute that mandates a process rather than a particular result."  *SPARC*, 352 F.3d at 557; *see also Sierra Club v. U.S. Army Corps of Engineers*, 701 F.2d 1011, 1029 (2d Cir. 1983) (citing cases).  The standard for judicial review of claims brought under NEPA is found in section 10(e) of the Administrative Procedure Act ("APA"), which provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2)(A); *see Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375-76 (1989); *Natural Resources Defense Council, Inc. v. U.S. Army Corps of Engineers*, 457 F. Supp. 2d 198, 220 (S.D.N.Y. 2006).  This standard is "narrow and highly deferential," *County of Rockland v. U.S. Nuclear Regulatory Comm'n*, 709 F.2d 766, 776 (2d Cir.) (internal quotation marks omitted), *cert. denied*, 464 U.S. 993 (1983), limiting the court's inquiry to a determination of whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).  An agency's decision is accorded a "presumption of regularity," *id.*, and the party challenging

---

[4]The regulations cited have been promulgated by the CEQ to provide specific guidance for complying with NEPA.  *See* 40 C.F.R. §§ 1500-1508.

the decision has the burden of proof.  *County of Seneca v. Cheney*, 12  F.3d 8, 12 (2d Cir.

1994).

Given this narrow scope of permissible judicial review, the only role for a court called

upon to determine a particular agency's compliance with the substantive EIS requirements

of NEPA is "to insure that the agency has taken a 'hard look' at environmental

consequences; it cannot 'interject itself within the area of discretion of the executive as to

the choice of the action to be taken.'"  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21

(1976) (quoting *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 838

(D.C.Cir. 1972)).  The court "may not rule an EIS inadequate if the agency has made an

adequate compilation of relevant information, has analyzed it reasonably, has not ignored

pertinent data, and has made disclosures to the public."  *Sierra Club v. U.S. Army Corps

of Engineers*, 701 F.2d at 1029 (footnote omitted).

> The district court does not sit as a super-agency empowered to substitute its scientific expertise or testimony presented to it *de novo* for the evidence received and considered by the agency which prepared the EIS.  The court's task is merely to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors.  The court is not empowered to substitute its judgment for that of the agency.  This is particularly true when it comes to evaluating the factual conclusions of the EIS.  If the agency's conclusions have a substantial basis in fact and if the EIS has set forth responsible opposing scientific views it is not for the district court to resolve conflicting scientific options.

*Id*. at 1029-30 (internal quotation marks and citations omitted).  Accordingly, "[t]he task of

the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to

the agency decision based on the record the agency presents to the reviewing court."  *Fla.

Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).

In this case, plaintiffs' primary contention is that DOE has improperly "segmented" the environmental impact review of the WVDP by "rescoping" the EIS into the waste management phase and the decommissioning/long term stewardship phase. The Second Circuit's opinion in the *SPARC* case provides guidance in this regard. *SPARC* addressed the issue of segmentation with respect to environmental review of a construction protect involving interstate highway access to an airport. As explained by the circuit court, segmentation of a project generally "is to be avoided in order to insure that interrelated projects, the overall effect of which is environmentally significant, not be fractionalized into smaller, less significant actions." *SPARC*, 352 F.3d at 559 (quoting *Town of Huntington v. Marsh*, 859 F.2d 1134, 1142 (2d Cir. 1988) (internal quotation marks omitted)). The primary harm sought to be avoided by NEPA's restrictions on segmentation is the "piecemealing" of major actions with potential environmental consequences into smaller components "to escape the application of NEPA to some of its segments." *Save Barton Creek Assoc. v. FHWA*, 950 F.2d 1129, 1140 (5th Cir. 1992). "A project has been improperly segmented . . . if the segmented project has no independent utility, no life of its own, or is simply illogical when viewed in isolation." *SPARC*, 352 F.3d at 559 (citing *Hudson River Sloop Clearwater*, 836 F.2d at 763-64)).

Under the regulatory guidelines, a project that bears some relationship to a larger undertaking can nevertheless be segregated as long as the project: (1) is of sufficient length to address environmental matters of a broad scope; (2) has independent utility or independent significance; and (3) will not restrict consideration of alternatives for other reasonably foreseeable actions. *SPARC*, 352 F.3d at 559 (citing 40 C.F.R. § 1508.25(a)

(CEQ regulations)).   As the Fourth Circuit has explained: "[S]egmentation of one phase of a larger project prior to completion of the environmental review of the entire project constitutes impermissible segmentation only if the component action has a 'direct and substantial probability of influencing decisions on the larger project.'"   *State of South Carolina ex rel. Campbell v. O'Leary*, 64 F.3d 892, 898-99 (4th Cir. 1995) (quoting *State of North Carolina v. City of Virginia Beach*, 951 F.2d 596, 603 (4th Cir. 1991)); *accord Senville v. Peters*, 327 F. Supp. 2d 335, 353-55 (D.Vt. 2004) (finding even a modest showing of independent utility sufficient to rebut claim of segmentation).

More specifically, the CEQ regulations define the types of "actions (other than unconnected single actions)" to be considered in determining the scope of an EIS, as follows:

> (1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement.  Actions are connected if they:
> (I) Automatically trigger other actions which may require environmental impact statements.
> (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.
> (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.
>
> (2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.
>
> (3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography.  An agency may wish to analyze these actions in the same impact statement.  It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

40 C.F.R. § 1508.25(a).

In this case, defendants have highlighted several factors in support of their position that DOE's decision to issue the Waste Management EIS and ROD prior to completing the pending Completion and Closure EIS does not constitute impermissible segmentation. First of all, it is clear that short-term waste management and off-site disposal of waste do not "automatically trigger" closure of the Center, and can proceed whether or not closure and decommissioning is accomplished in the future.   The Waste Management EIS and ROD cover waste management and off-site disposal activities for a ten-year period, whereas the decommissioning and closure issues involve on-site actions that could last for many decades (*see* AR 5; 205-06).  As such, the waste management phase is of sufficient length to address environmental matters of a broad scope (*see, e.g.*, environmental effects analysis at AR 93-160), and its timing and geography are distinct from the timing and geography of the decommissioning/closure phase.

Furthermore, it is clear to the court that off-site disposal of LLW has value and utility independent of any later closure activities, and represents a logical and publicly beneficial action even if closure of the site was never to occur.  Beyond its function as one of the activities required by the WVDP Act, it cannot be disputed that removal of waste from the Center to an off-site disposal facility will ultimately result in reduced radiological risk to workers and the public, and would need to be accomplished in any event regardless of the decisions to be made with respect to decommissioning and long-term management  (*see, e.g.*. AR 4-5; 205-06; 211).

Significantly, the Waste Management EIS and ROD deal exclusively with activities conducted by DOE as lead agency, while the pending Completion and Closure EIS will examine closure of the site with DOE and NYSERDA as joint lead agencies (*see* AR 54-55;

862).  Considering the inability of DOE and NYSERDA to reach agreement on the overall

future course of action for long-term stewardship of the site,[5] this "segmented" approach

presents a logical means of getting the dormant project moving again by addressing critical

interim issues related to the off-site disposal of much of the low level radioactive wastes

remaining at the WVDP site.

In addition, based on the record presented, the court is satisfied that DOE's decision

to proceed with shipment of low-level and mixed low-level radioactive wastes off-site does

not have a "direct and substantial probability" of influencing the decision on the pending

Completion and Closure EIS.  *O'Leary*, 64 F.3d at 898.  As explained in the Waste

Management EIS:

> The waste management actions proposed in the EIS would not prejudge the
> range of alternatives to be considered or the decisions to be made for
> eventual decommissioning and/or long-term stewardship of the WVDP.
> Rather, these actions would allow DOE to make progress in meeting its
> obligations under the West Valley Demonstration Project Act that pertain to
> waste management . . . and they are consistent with programmatic decisions
> DOE has made . . .regarding the waste types addressed in the EIS.  Those
> decisions and their respective EISs as they apply to the WVDP, provide for
> shipping wastes from the West Valley site to other regional or centralized
> DOE sites for treatment, storage, and disposal, as appropriate.  Additionally,
> there would be no irreversible or irretrievable commitments of resources that

---

[5]As defendants point out, the ongoing disagreement between DOE and NYSERDA as to the
appropriate process for closure of the Center is perhaps the single most significant factor underlying the
DOE's revised strategy.  The record reflects that, while DOE and NYSERDA have been in confidential
negotiations for several years, they have been unable to agree on which entity should bear the costs of
paying prospective disposal fees for the HLW (estimated in the hundreds of millions of dollars) and what
the Center should look like in the future (*see* AR 1079).  The U.S. General Accounting Office has
recommended that Congress consider amending the WVDP Act to clarify the financial and stewardship
responsibilities of DOE and the State of New York as a means of resolving the standoff (*see* AR 1102),
but no Congressional action has been taken to date.

Given the impact of this disagreement on the current dispute now pending with this court, the long
pendency of the disagreement, and the clear mandate of the WVDP Act that the DOE carry out the tasks
required for ultimate closure of the site, the court strongly urges defendants to take timely measures to
resolve any remaining differences of opinion with the State in order to appropriately address the important
matters at hand.

would prejudice decommissioning decisions.  The Decommissioning and/or Long-Term Stewardship at the West Valley Demonstration Project and Western New Your Nuclear Service Center EIS will be the continuation of the Completion and Closure EIS begun in 1988 and issued in draft in 1996.

AR 57.

On the other side of the summary judgment coin, plaintiffs have not come forward with any showing to support their position that this kind of segmentation of the EIS process has no independent utility or is illogical when viewed in isolation.  Instead, plaintiffs contend that the government acknowledged during the 1996 scoping process and in the 1996 Draft EIS – as well as in the 1987 Stipulation – that the issue of waste management and removal could not be considered separate from the concept of longer term stewardship (*see* Attorney Affidavit, Item 14, ¶ 112).  As stated by plaintiffs' counsel, these issues "were interrelated as water to a beach.  Where one ends, the other begins and as the tides move, so does the line.  They need to be considered in tandem and cannot be considered in a separate decision making process."  (*Id.*)

This statement is not supported by any citation to record, and plaintiffs have provided no basis for this court to consider their attorney's opinion as competent evidence on this motion.   In any event, the record suggests that DOE has fully explained its reasoning for not immediately finalizing the Draft 1996 EIS, as well as the basis for its revised approach (*see, e.g.*, the March 26, 2001, Notice of Intent, 66 Fed. Reg. 16447; AR 861-65).

Plaintiffs have also failed to present any evidence to show or suggest that the DOE's strategy is designed to escape environmental review regarding closure and completion of the WVDP site.  To the contrary, the record suggests that the DOE's completion of a

thorough EIS on short-term waste management activities within its control, and subsequent completion of another EIS (with NYSERDA as joint lead agency) on the longer-term issues of closure and stewardship involving state-owned property, increases the opportunity for public scrutiny of the potential environmental impacts of long-overdue future activities at the site.

In sum, plaintiffs have not met their burden under NEPA to demonstrate to the court's satisfaction that DOE artificially segmented the project in order to evade environmental review, or otherwise acted arbitrarily and capriciously as a matter of law, when it issued the Waste Management ROD and EIS.   Accordingly, plaintiffs are not entitled to summary judgment in their favor on the NEPA claim.

For the same reasons, and mindful of the appropriate standard of review under the APA, the court finds that the agency's decision was based on a consideration of the relevant factors, with no clear error of judgment.   The administrative record amply demonstrates that, in developing its revised strategy for advancing the project in accordance with statutory goals, DOE has adequately compiled relevant information, has analyzed it reasonably without ignoring pertinent data, and has made disclosures to the public to allow for full consideration and balancing of the environmental factors.   Affording a presumption of regularity to the agency's findings, and in light of the absence of any showing by plaintiff that the agency's actions were somehow arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, the court finds that DOE has taken a sufficiently "hard look" at the environmental consequences of its decision to proceed with shipment of low-level and mixed low-level radioactive wastes off-site, leaving

decommissioning and closure for later environmental review under the substantive EIS requirements of NEPA.

Accordingly, the court finds that defendants are entitled to summary judgment dismissing plaintiff's NEPA claim.

## II.    Breach of the 1987 Stipulation

Plaintiffs also claim that DOE's revised strategy for environmental impact review of the remaining actions required by the WVDP Act (waste disposal, decontamination and decommissioning) has resulted in a breach of the specific provisions of the 1987 Stipulation, under which the DOE agreed to begin the "closure [EIS] process -- including the scoping process" no later than 1988 and continue the process "without undue delay and in an orderly fashion consistent with applicable law . . . " (AR 198).

The parties do not dispute the long-settled legal principles governing the court's summary judgment review of a claim for breach of a settlement agreement.   Simply put, a stipulation for settlement is a contract, interpreted under general principles of contract law.  *See Reich v. Best Built Homes,* 895 F. Supp. 47, 49 (W.D.N.Y. 1995) (citing *Janneh v. GAF Corp.*, 887 F.2d 432, 436 (2d Cir. 1989)).  When the federal government is one of the contracting parties, and the contract is entered into pursuant to a federal statute, the interpretation of the contract is "governed exclusively by federal law . . . ," *Boyle v. United Tech. Corp.*, 487 U.S. 500, 504 (1988), which ordinarily adopts the relevant state law rule "unless there is a significant conflict between the state rule and a federal interest." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 189 (2d Cir. 2006).

Under these general rules, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add or vary the writing." *Torres v. Costish*, 935 F. Supp. 232, 234 (W.D.N.Y. 1996) (internal quotes and citation omitted).  As the party claiming breach of the Stipulation's terms, plaintiffs bear the burden of proving the breach. *See Technical Assistance Intern. v. United States*, 150 F.3d 1369, 1373 (Fed. Cir. 1998).

As discussed above with respect to plaintiffs' NEPA claim, plaintiffs have not met their burden on this motion for summary judgment to demonstrate that, as a matter of law, DOE's two-EIS approach was devised as a means of evading environmental impact review of the closure and long-term stewardship issues, or was otherwise undertaken arbitrarily or capriciously.  In the absence of any such showing, this court has no basis to find that DOE's revised strategy has resulted in a breach of the contractual obligation to continue the NEPA process "without undue delay and in an orderly fashion consistent with applicable law."

As the administrative record amply reflects, the overall scoping process commenced in 1988, with DOE and NYSERDA acting as joint lead agencies, resulting in the development of the 1996 Draft EIS.  There is little dispute that the 1996 Draft EIS comprehensively covered the remaining actions to be completed under the WVDP Act, and evaluated different alternatives for closure and long-term stewardship of the facilities at the Center (*see* AR 2098).  The draft was circulated for public comment, and DOE received

numerous comments from a wide variety of individuals, organizations, and government entities (*see* Comment Log Sheet, AR 1234-44).

As discussed above, DOE decided not to move forward with the action contemplated by the 1996 Draft EIS, based on the comments it received, ongoing discussions between DOE and NYSERDA, and various other factors.[6]  Instead, DOE decided to revise its strategy to complete the remaining activities required under the WVDP Act in two phases, first addressing short-term off-site waste disposal activities and then addressing the longer-term closure and stewardship activities (*see generally* AR 861-65). While it is clear that this revised approach has resulted in delaying environmental impact review of the closure and stewardship matters, the record also reflects that the strategy has allowed DOE to make progress towards completion of at least a portion of the WVDP Act requirements (*i.e.*, transport and disposal of certain LLW) while negotiations with the State on closure issues continue (*see* AR 862).

The record further reflects that DOE kept the public informed of its progress toward meeting the goals of the WVDP Act, its strategy with respect to NEPA requirements, and its compliance with the terms of the 1987 Stipulation (*see, e.g.*, AR 1036-40; 1046-52; 1055-58; 1119-28; 1147-58; 1178-83; 1185-90; 1207-13; 1214-25; and 1226-33).  As previously discussed, DOE also published detailed notice of its revised strategy, and solicited public comments (66 Fed. Reg. 16447, *reproduced at* AR 861-65).  DOE

---

[6]Some of the factors identified by defendants as precipitating DOE's revised approach include: (I) DOE's May 1997 programmatic EIS on the management and disposal of radioactive and hazardous waste, which provided, among other things, the opportunity for centralized disposal of LLW and MW at various DOE facilities (briefly summarized at AR 62); (ii) the issuance of NRC's Policy Statement on Decommissioning Criteria for the West Valley Demonstration Project released as a draft on December 3, 1999, and in final form on January 25, 2002 (discussed at AR 1028); and (iii) funding restraints (*see id.*).

subsequently responded to comments on the revised strategy, and further refined the scope of the Waste Management EIS by removing certain decontamination activities which commentors suggested were closely connected with the actions being considered in the pending Completion and Closure EIS (*see* AR 56, 65).

In addition, this court's reading of the plain and unambiguous terms of the 1987 Stipulation reveals no language requiring DOE to adopt the 1996 Draft EIS as final, or curtailing DOE's ability to reevaluate its strategy for completing environmental impact review in response to comments and concerns raised after publication of the draft. Nor is there any language precluding DOE from scoping and preparing a separate EIS with respect to off-site waste disposal, as explained in detail in response to comments on the draft Waste Management EIS (*see* AR 212). Further, as previously discussed, the record reflects ample justification for short-term management and off-site disposal of waste independent of the long-term closure decision.

Based on this review of the contractual language, and considering the record presented on this motion, the court finds that plaintiffs have failed to meet their burden to demonstrate a clear breach of the 1987 Stipulation obligating DOE to continue the NEPA process "in an orderly fashion consistent with applicable law . . . ." Accordingly, plaintiffs are not entitled to summary judgment in their favor on their breach of contract claim.

For the same reasons, because no rational review of the administrative record could demonstrate that DOE has failed to proceed in an orderly fashion consistent with the requirements of NEPA as the Stipulation requires, or has failed to provide the public with a full and fair opportunity to review and comment on the revised strategy for moving the

project forward, defendants are entitled to summary judgment dismissing plaintiffs' claim for breach of the 1987 Stipulation.

### III.     Waste Incidental to Reprocessing

As mentioned above, the Waste Management ROD states that the decision to ship low-level and mixed low-level radioactive wastes off-site "includes wastes DOE may determine in the future to be LLW or MLLW pursuant to a waste incidental to reprocessing by evaluation process" (AR 5).  Plaintiffs allege in their third claim for relief that DOE lacks authority to reclassify HLW as LLW or MW pursuant to such a process, and seek an order prohibiting DOE from doing so (*see* Item 1, ¶¶ 100-09; 121-22).

This claim is virtually identical to the claim rejected by the Ninth Circuit as "unripe" in *Natural Resources Defense Council ("NRDC") v. Abraham*, 388 F.3d 701, 707 (9th Cir. 2004).  In that case, the plaintiffs (including NRDC) sought declaratory and injunctive relief to prohibit DOE from implementing its regulatory authority[7] "in a way that redefines high-level radioactive waste as waste incidental to reprocessing and thereby reduces it to handling as mere low-level radioactive waste or transuranic waste." *Id*. at 703.  The circuit court found the plaintiffs' concerns about reclassification to be speculative and not justiciable until the DOE actually made a "waste incidental to reprocessing" determination. *Id*. at 706.  Summarizing its ruling, the Ninth Circuit stated that, "[d]espite NRDC's anxiety

---

[7]As recognized by the Ninth Circuit, this authority is derived from DOE Order 435.1 (entitled "Radioactive Waste Management," approved July 9, 1999) (*reprinted at* 1999 WL 33573949 (U.S. Dept. of Energy)), and its accompanying manual and implementation guide (DOE M 435.1-1), promulgated pursuant to the Atomic Energy Act, 42 U.S.C. § 2151 *et seq*.; the Energy Reorganization Act, Pub.L. No. 98-438, 88 Stat. 1233, codified at 42 U.S.C. § 5801 *et seq*.; and the Department of Energy Organization Act, Pub.L. No. 95-91, 91 Stat. 565, codified at 42 U.S.C. § 7101 *et seq*. *See NRDC*, 388 F.3d at 704.

[about reclassification], the courts must await the coming of a proper time for decision, if, in the long run, that time ever comes.  Maybe it never will come because DOE will not take actions that require-or even seem to require-court intervention.  Who knows?  In fine, the issue is not yet ripe."  *Id.* at 707-08.

This reasoning is persuasive, and equally applicable here.  Plaintiffs' allege only that DOE lacks the authority to reclassify waste as "incidental to reprocessing," prior to any actual reclassification determination.   As the circuit court held in *NRDC*, this kind of challenge must await "some truly concrete action . . . ," *id.* at 707, and judicial intervention at this point "would unduly interfere with the administrative process and that the courts would benefit greatly from a reification of the issues through further factual development.  The case is, in a word, 'unripe.'" *Id.*

Accordingly, defendants are entitled to summary judgment on plaintiffs' claim challenging DOE's authority to implement the criteria for reclassifying waste as incidental to reprocessing.

**IV.    Plaintiffs' Request for Attorney Fees**

Finally, plaintiffs also request an award of attorneys' fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.  This request is denied.

In order to be entitled to attorney's fees under the EAJA, a plaintiff must be a "prevailing party" and must meet other statutory prerequisites.   *See* 28 U.S.C. § 2412(d)(2)(B).   As the above discussion amply demonstrates, plaintiffs have not

established prevailing party status in this case.  Accordingly, the court need not engage in further inquiry with respect to the remaining EAJA requirements.

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiffs' motion for summary judgment (Item 14) is denied.  Defendants' motion for summary judgment (Item 20) is granted, and the complaint is dismissed in its entirety.

The Clerk of the Court is directed to enter judgment in favor of defendants.

So ordered.

_____
\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated: September 28, 2007

p:\pending\2005\05-614.sept.13.07